and for Charles Updegrove. And how are you going to divide up the argument, or are you going to divide it up? We are going to divide it up. That's what I'm addressing now. I'm going to address the court first on the mens rea issue, which has been presented by Ms. Moon and Mr. Updegrove. Counsel for Mr. Updegrove will then address the court regarding the outburst and the court's denial of a request for mistrial based on that outburst. I believe that counsel for Mr. Updegrove may also address a sentencing issue that applies to Mr. Updegrove. And then counsel for Mr. Combs will address sentencing issues. And we would like to reserve five minutes. So any idea as to how you want to divide that up in terms of time? We were thinking of fairly equally. Approximately five minutes each. Five minutes each, hoping to save five minutes for rebuttal? Correct. Five, five, five. Okay, now that we got the housekeeping out of the way, could you put 20 minutes on? There we go. Okay, thank you. Thank you. We contend that the district court here erred in refusing to instruct the jury on willfulness in regards to the presenting a false claim to the government. The charge was 18 U.S.C. 287, which prohibits false, fictitious, or fraudulent claims on the government. The court proceeded with three prongs, essentially. In regards to Ms. Moon and Mr. Updegrove, they were acquitted under the fraudulent prong, but convicted under the false statement prong. The underlying statement here, we believe it's significant, that what the indictment alleged and what the jury really focused on was the claim that the defendant submitted fraudulent tax returns. If they were prosecuted for submitting those fraudulent tax returns, willfulness would definitely apply, and good faith defense would be permitted. You want us to read that into the false, submitting a false? Well, yes, in regards to, at least in regards to false claims based on the tax code, where willfulness is an element, we And when you say willfulness, in your view, willfulness is not satisfied by knowledge of falsity? No, I think it requires knowledge that you're violating the law or doing something that the law forbids. More than just knowledge that it is a false return? Yes. Because I think the problem with just a false return is, here the issue, Ms. Moon proffered a good advised that most debts that the people owed with the working of the Fed and the banking system and whatnot, it's fairly convoluted, but those constituted interest that could be claimed as refunds on tax returns. I think clearly those weren't interest, but I know Ms. Moon and I believe some of the other defendants had good faith beliefs that it was interest, and they believed in good faith that when they were submitting those returns that they were legitimate, that it was a legitimate way to do so. And the jury was instructed how with respect to falsity? That it was, that the defendant submitted a false claim and knew the claim to be false when they made it. And was the jury instructed that the defendant had to know that it was false? I believe so, yes. Yes. So the question is whether an instruction that says falsity and knowledge of falsity is enough to convict, whether that's the state of the law? Well, correct. I think that the law is ambiguous. I don't believe that there actually is a well-defined law in that area. I know that in the Ninth Circuit cases of Milton and Dorotich, both of those cases approved willfulness instructions. In Milton, which was a non-tentative case. Milton approved it, but it didn't require it. That's why I said that intent to defraud was not required, but that the jury was properly instructed on the willfulness requirement. They didn't explicitly say you have to be instructed on willfulness, but they said that the jury was properly instructed on willfulness. In Dorotich, the issue was whether there was a denial of a good faith instruction. The Court said that the failure to issue the good faith instruction was excused because the jury was basically instructed on the intent to defraud and willfulness were required. And we agree that intent to defraud is not required, but we believe that willfulness should be. And the issues are all really interrelated. And I think that there is a difference between an intent to defraud or a willful act and knowledge that something is false. And I think that that's illustrated by the jury's verdicts here. They distinguish between fraudulent and false statements. Some defendants were convicted of fraudulent statements, some convicted of false statements, some convicted of both. But they clearly delineated between fraudulent statements and false statements based on essentially the same evidence. And we think also that many other districts, the 4th, 11th, 6th, and 5th, have basically all approved willfulness instructions. And I think in Nash, the 6th district actually, sorry, the 6th Circuit, excuse me, expressly stated that willfulness should be read into the statute. And I think that the cases that the government relies on, Atalig, I don't know if I'm pronouncing that correctly, and Kazi, those cases really have nothing to do with willfulness or good faith. Atalig was the executive branch. And Kazi, the issue was basically liability for aiding and abetting. It did not, those cases give absolutely no consideration to good faith, to willfulness. Atalig repeats the elements, which are just the generic elements from Kazi. Kazi just states these are the generic elements with no authority, no citation at all. I'm sorry. In the interest of good relations with your co-counsel, I think I'll help you stop. Thank you. Thank you, Your Honor. May it please the Court, Joanna Schiavone on behalf of Appellant Charles Uptergrove. And I'm going to focus for the moment on the outburst issue, and then if there are any questions on the sentencing issues I've raised, in particular the denial of the acceptance of responsibility to Lovell, I'm happy to answer those.  The question for this Court is whether the episode presented an unacceptable risk of impermissible factors coming into play. And our position on behalf of all three defendants is that both what happened during and in the presence of the jury, and then what happened subsequently when they were called back in, when the Court gave what it termed an admonition to the jury, and then the remainder of the trial in terms of the defense theory, all of those things really did present this unacceptable risk of impermissible factors coming into play. What were those? I mean, I read the transcript, so I know what she said. It was a sort of a rant. And she ends up by saying, the government's coming for you, too, to the jury. And your children. Right. I mean, it's clearly the outburst of a defendant who's kind of, I want to say, kind of on the edge, maybe. And as a result, the district judge excludes that defendant, so she sees it on video for the rest of the trial. But I have trouble seeing how that results in prejudice to the other defendants. Well, thank you for the question, Your Honor. So it does, it was an extended outburst, as Your Honor points out. It was actually two, more than two minutes, the time stamp on the video reveals, uninterrupted by the Court, in the presence of the jury, with the other defendants and counsel really surprised. Then, subsequent to that, the jury went out for this quick break, and the Court brought them back, and then we were all really surprised by what happened, and now we need some time to address it. Then there was a three-hour break where the jury had nothing to do other than either go to lunch or kind of mull over what had, the bizarre episode that had just happened. So a three-hour, half-day, essentially, delay. They come back, and my client, who had just gone down, because this episode happened, he then immediately testified. And so what this architected — But before he testifies, does Judge Ishii, at that point, before the testimony, admonish the jury, saying — Yes. — don't pay any attention to that, this has no relevance to the government, in a sense, of the da-da-da? So what he said, and this is, it starts, the admonition starts on Excerpt of a Record 169, and what he says, the first thing he says, well, he gave the jury sort of the brief one at the mini-break, and then there was the two-and-a-half-hour break. But what he said after the two-and-a-half-hour break, he said, all right, the jury is present. Members of the jury, thank you for your patience. Obviously, we had an unusual situation here. I did want to give all the parties an opportunity to reassess and proceed forward so we don't have any issues that arise later. He then tells the jury to put it out of their mind. He says, I'm so concerned — I'm concerned you may be so upset at what was done and said it would prejudice the other defendants in the action. He says, then, if anyone had any concerns, they should raise them with the court individually. But really, where we see the prejudice is that the defense theory was based on the fact that she had given each of them advice that they had followed, and as my colleague just asserted, it was based on this good-faith reliance on that. It's really hard to say that the jury could then compartmentalize and find reasonableness and credibility based on what had just happened with this. So you just displayed yourself to be an obvious nutcase. I wouldn't use necess—well, if Your Honor is going to characterize it that way, maybe. And she had invoked religious — I'm trying to characterize in a way favorable to your client and your argument. Yes, thank you. That's the argument. How could they possibly rely on a person who has such an outburst? And after that admonition, my client, Mr. Updurove, then gets up to testify and tried to explain this. It's really hard to put that out of your mind as a juror. And we know from the Manny case that courts have said, even where a court gives that kind of admonition and says, you know, if you put this out of your mind, there is such a toxic risk of this that we don't even — we can even discount jurors saying that they're not prejudiced. That a juror may be — and defense counsel actually made this argument — there was also an element of peer pressure by not individually polling them, but simply asking them to raise their hand if they felt like they were potentially going to become impartial or take the court side. And so our argument really is, in addition to the outburst, you had this scenario then subsequently architected that was really prejudicial, and it really went to the crux of the defense theory of the case, which was reliance on the very co-defendant who had engaged in the outburst. I do have a question about the acceptance, but I don't want to interrupt if you want to talk more about that. No, no, no, please. No, I get the argument. Thank you. Thank you. What are you relying on to say that Mr. Updurove accepted responsibility for making a false statement? There was some confusion about the record where you had cited page — ER page 485, and then it turned out there wasn't any 485. And that — and that I — And you cited 675, but that's not Updurove's testimony. It's attorney argument. So if you know offhand, you could tell us, or if not, maybe you could submit quickly afterwards where it is that Updurove — where you say Updurove actually accepted responsibility at trial for putting false information in his return. And I'll be asking the government if they concede that, but — Yes. And so it — the falsity in terms of he understood at the time he gave his testimony that it was not accurate, but that not — that at the time, that he relied on a good-faced defense that he — what he believed it at the time that — that he asserted it and the time he filed the amended return. But then he understood that the advice actually wasn't accurate. And so now he understands the interest was not actually interest or deductible. And so that — that is where we have a disagreement with — with him not accepting responsibility. And subsequent to trial, he has also undertaken a lot of efforts to remedy that and negotiated with the IRS to make payments. And so he has certainly acknowledged that in all the subsequent conduct with the — which the district court found to be sincere in his efforts to do that. But he — but he did insist at trial that at the time he filed it, he didn't know it was false. And so that was his defense, that he filed it in good faith and in reliance on the advice that he had received.  GOTTLIEB Well, he didn't know that there was false information? It's not a false return. It's not a tax claim. It's a false information. If he says, I was entitled to $6 million of interest, he believed that to be true at  Is that what he said? MS. CARRINGTON Yes. MS. GOTTLIEB And where did he say that?  CARRINGTON And I don't have that. I can try to find it for rebuttal, the exact testimony. MS. GOTTLIEB Okay. Or send it in later. MR. Are there further questions on the outburst issue?  GOTTLIEB No, I think not. MS. CARRINGTON We can reserve. MR. GOTTLIEB And if you can find it for rebuttal, that would be useful so we can get it all on the table at the same time. MS. CARRINGTON Thank you. MR. GOTTLIEB Thank you. MS. ST. JULIAN Good afternoon, Your Honors. Andrea St. Julian for the defendant, Leroy Combs. I'd first very briefly like to touch on the mistrial issue. This case was really largely about intent. The actual form, the actual returns submitted weren't really, there was really no dispute about that. The problem with Ms. Bolanos' outburst was that it showed her to be so incredibly irrational, and she also specifically linked herself to all the defendants, including my client, Mr. Combs. And so this gave the jurors the impression that there was probably really no rational basis for Mr. Combs' actions. And that's why Mr. Combs was so prejudiced by what Ms. Bolanos did. And I think it was particularly prejudicial to Mr. Combs because he didn't testify. He exercised his right not to testify. And so the impression that the jury got of Mr. Combs came from Ms. Bolanos' outburst and her linking of her thoughts and activities with that of Mr. Combs. And so I just wanted to touch on the prejudice particular to my client. JUDGE LEBEN And my recollection is Ms. Bolanos herself does not testify. ANDREA ST. JULIAN I know. I don't believe that she testified. So, and so... JUDGE LEBEN This was the only exposure the jury had to her. Only exposure to her and...  JULIAN Well, they saw her for eight days. JUDGE LEBEN It's true. ANDREA ST. JULIAN Except on the eighth day of trial. JUDGE LEBEN True. And in terms of... ANDREA ST. JULIAN They removed her from the courtroom. JUDGE LEBEN And in terms of looking at Ms. Bolanos, my trial counsel pointed out during the proceeding that Ms. Bolanos had appeared catatonic during much of the proceedings. And so she felt very concerned on that basis as well. And so, again, this had a great impact on my client because that, again, in her outburst, really she... JUDGE LEBEN Did the defense counsel ever bring to Judge Ishii's attention that she may have had some mental problems? ANDREA ST. JULIAN Yeah, my trial attorney did, yes. JUDGE LEBEN Before the outburst? ANDREA ST. JULIAN I don't believe so, but it was after the, when they were discussing the outburst and also talked about mental health issues that Ms. Bolanos may have had. So I just wanted to talk about prejudice as to my client. I then want to go on to my sentencing issue. And the first thing I'd like to do is I'd like to apologize to the court. The court may have noticed that I uploaded the wrong PSR with the excerpts of record. And I did not notice that mistake until today. I deeply apologize for that. Also, the references in my briefing are to the original PSR as opposed to the final. So with that said, the thrust of my sentencing argument remains the same. Essentially, what the district court did was it sentenced Mr. Combs based on the unsupported belief that Mr. Combs had a long history of a criminal intent to violate tax laws. JUDGE LEBEN Actually, he doesn't ever say intentional. The brief quotes alludes many times to him saying it was intentional, but he actually never did. ANDREA ST. JULIAN But he said criminal. If you look at ER 22, at excerpts of record page 22, the very first paragraph, he talks about Mr. Combs' criminal actions. And for them to be criminal, they have to have intent, a criminal intent. And the record simply does not support that. And if you simply look at the facts, I'll just briefly go through them, particularly as found in the supplemental ER with respect to the tax court's decision starting at supplemental ER 159. This all comes from one tax year, okay? This is 1994, all right? Mr. Combs files that 1994 tax return in 1997. Far from exhibiting any criminal intent, this shows that Mr. Combs is trying to do the right thing by filing a tax return, albeit a few years late, but he's trying to do the right thing, all right? When he files it, he discovers for the first time that the trusts that two attorneys and two CPAs set up for him were not valid. And so he owes taxes on approximately a little less than $300,000. He further finds out that the IRS does not allow any of the business deductions that he took. Now, these businesses were, the income is primarily from two daycares, okay? Quite a bit of business expenses in terms of employees, in terms of physical structure. Mr. Combs was not allowed to deduct any of those expenses because the court found that he wasn't able to adequately substantiate them. So he is now on the hook for all of, for every penny of this money that he really simply never had, and that's why he kept repeating, I was taxed on money I never had. And that's because this income, this supposed income really was mainly business expenses for his employees. So this sets up a really horrible chain of events for Mr. Combs. He doesn't have any money. He obviously doesn't trust professionals anymore because of the trust that they set up for him. And so he sets about a course of action to try to do the best he can to manage this situation. The first thing he does, one of the first things he does is he goes to tax court and he tries to explain what happened. He doesn't explain well. He does, he, the court did ultimately find him to not be forthcoming in terms of filings. But again, these are not, these are not examples of criminal intent to violate tax laws. We're pretty far into rebuttal time. Why don't I stop you and then we'll save, we'll give you enough time to do the rebuttal for all three of you. Thank you, Your Honor. May it please the Court, Grant Rabin for the United States. Good afternoon, Your Honors. If you could keep your voice up, I would appreciate it. Yes, Your Honor. On the first issue of the outburst, the fundamental question is whether or not the district court abused its discretion in how it responded to the outburst. And the answer is that the court did not abuse its discretion. It did everything that it could have been expected to do in response to it. Short of a mistrial. Correct, Your Honor. And I think factually it's a... For individual questioning of jurors. Well, I think that is for the court to decide. And obviously, this court gives deference to the district judge in determining how to deal with the jury. And the district judge specifically said that he did not want to individually voir dire the jurors because he thought it would add additional attention to the issue. And I don't think it was an abuse of discretion for him to do that. He dismissed the jury quickly. He heard argument from the parties. He requested that a cautionary... Well, you know, it's always a little odd. We often ask the jury generally, well, ladies and gentlemen, do you have any concerns about what happened, what you just witnessed in the courtroom? Realistically, the jurors aren't going to say, judge, I have a big problem with what happened. It doesn't really happen that way. Sometimes it does, I guess, but... Importantly here, this was about halfway through the trial. Right. There was about two and a half... Nobody wanted to declare a mistrial, I bet. That may be the case, but we were about... There were two and a half days of voir dire to pick this juror. The judge was quite familiar with the jurors. He specifically noted on the record that he was and that he believed that if there were any concerns, he would know that. The cautionary instruction itself was one that was proposed by defense counsel. Now, it was at the request of the court. Here's why this is a tricky question for me. I mean, I understand the dilemma that Judge Ishii is in, and it seems to me that he behaved perfectly appropriately unless the alternative... If he's not going to declare a mistrial. I think he has discretion to say whether he will or will not interview them individually, draw attention to it, ringing the bell sequentially instead of just that one time. But here's the problem. This defendant wasn't going to testify, didn't testify. The jury is not going to have a sense as to what she's really like, except maybe her demeanor as she sits there. And part of the defense of these defendants is we relied on her, and the outburst shows her to be unreliable. I mean, that's the problem. I understood, Your Honor. And I'd like to address that point because... Would you please? Yes. That's why I raised it. Yes. What actually happened at the trial, I don't think is how it was characterized by defense counsel. As for any of the defendants, Mr. Updegrove testified. During his testimony, the thrust of his defense was not that there was this, I think, as Your Honor said, crazy woman, and I did what she told me to do. I relied on her. Therefore, I didn't have the intent. That really wasn't the thrust of his defense. The facts that came out at trial was that there was a group of people who were doing this. Bolanos, of course, was one of them. And for Mr. Updegrove's tax return, for example, the testimony from a cooperating witness for the government and for Mr. Updegrove is that a group of them filled out his tax form with him. And it wasn't pinned exclusively on Bolanos. So I don't agree with the defense's characterization of what their defense was. As for the other defendants, they didn't testify. So essentially, there was no defense. Obviously, that was their prerogative to do so. But they can't argue that, well, my defense was that I relied on Bolanos because that's not what happened. And in the government's case, we had a cooperating witness who was part of that core group who gave the jury a flavor of what Ms. Bolanos was like. It didn't depict her as some sort of, to use the word, crazy again. She was one of the group who were sovereign citizens. That wasn't his actual language. But they're sovereign citizens. They're tax protesters. And they were trying to steal money from the government by submitting these outlandish claims. So the idea that there's such an extreme prejudice because the entire defense was based on Ms. Bolanos's inappropriate guidance and counsel is not correct. And during Mr. Epdergrove's testimony, he pinned most of the blame on tax professionals he had been with, on lawyers, and on others in their sovereign citizen group, not Ms. Bolanos. So I don't think the prejudice inures to any of these defendants because somehow Bolanos was the ringleader, because that really wasn't what their defense was. I think some other important facts to look at is that the jury didn't just give a blanket verdict. All of these, all of the verdicts for the individual defendants were different. The government, the judge allowed the jury to decide on the false, fictitious, or fraudulent prongs. And there were individual determinations for each defendant. I think that shows that this didn't somehow overwhelm the jurors to the point where they said they're all guilty because that's not what happened. Even Ms. Bolanos herself was acquitted on two counts. So based on all of those facts, I don't think the court abused its discretion in how it handled this. And I don't think any of the fundamental rights that the defendants had to a fair trial were impinged by this outburst. And the Bamberger case says that passive defendants, which is how they describe the non-outburst defendant, that the prejudice doesn't inure to them. Some of the cases cited by the defense imply that the prejudice can go towards the passive defendants. But in every single case that the defense cites on the outburst, those are really extreme set of facts that are not the same as the facts here. In every one of those cases, there was either violence in front of the jury, there were repeated outbursts, the judge failed to do something. And the one case your honors have to look at is McCormick, which is the One Ninth Circuit case that is on point. And in McCormick, it says that the district judge's prompt handling of the matter and appropriate cautionary instruction resolves the prejudice. And even in McCormick, I think the district judge there did something that was probably a little bit out of line, which is he said in front, he or she said in front of the jury, I find you in contempt. Judge Ishii did not do that here. He acted extraordinarily calm. He responded to the situation. He dismissed the jurors. And it was a very short period of time in terms of it being written out. It was three or four paragraphs. And if you look at the substance of what she said, really what she was doing was attacking the government and the court. She wasn't saying Charles Updegrove is guilty and I'm innocent. She said the government and the court are crooks and they're framing us. So the substance of what she says is exculpatory. It's not inculpatory. Now, certainly the argument, they make the argument that it overwhelmed the judgment of the jury. If there are any further questions on the outburst, I'd like to move on to willfulness. I'm okay. And save a little time for acceptance of responsibility. Yes, I'd like to, Your Honor. The question is, does willfulness apply to 287? And the case law in this court is that it doesn't. We have recent unpublished decisions saying that it doesn't, and they rely on older published decisions saying that willfulness is not an element of 287. Now, what the defense is trying or what the appellants are trying to do is they're trying to stitch together this element with some scraps that they found in these other cases, in the Dorotage case and in Nash, which is an out-of-circuit case. And they're saying, look, we can read into the fact that this court approved the district court's jury instructions, which referenced willfulness, and somehow we therefore can read willfulness as an element into this crime. It's not. Statutorily, the language isn't there. The statute 287 itself was split apart from the false statements from 1001 in 1940. The false statements crime requires willfulness. That's the language that Congress put into that statute. And when they split it off from 287, Congress did not put willfulness into the statute. And other courts have noted that this is because the filing of a claim implies some level of willfulness, so it therefore doesn't have to be put explicitly into it. It's not just making some random statement. Such as under false statements. Here, you're making a claim, and it's going to the government, and there's a willfulness implied in that. That's another reason why there really isn't any willfulness as not an element to this offense. What about a good faith instruction? They asked for a good faith instruction. The Sixth Circuit in Nash? Is that the case? That's correct, Your Honor. Where they just said there should be a good faith instruction across the board. All elements. That's correct, Your Honor. So why shouldn't there be a good faith instruction here? Especially when you're dealing with tax law violations. And we have case law that recognizes that those are complex matters. People don't often understand what they're doing. Why shouldn't there be a good faith defense instruction? Number one, I think good faith flows from there being a willfulness as an element. Well, I'm willing to, irrespective, do you have to have willfulness in order to have a good faith instruction? The Sixth Circuit just said, we're going to apply a good faith instruction. I think the answer is in DeFore, which was an unpublished decision from this court, a recent decision. And it addressed the Fierro's-like defense, which is related to good faith, which is basically the idea that we're going to read willfulness into this type of statute because it's a complex regulatory scheme. And therefore, a good faith defense should apply. And this court said in DeFore that 287, it has not been read into 287. That willfulness is an element. And as a result, good faith can't be, shouldn't be read into it because the idea is I had good faith, therefore, I didn't have the intent. There was concurrence. I think it's DeFore where there was concurrence by Judge Reinhardt. He said, now, wait a minute. It's not also clear that good faith shouldn't be read into. There shouldn't be a good faith defense. Isn't that right? Your Honor, in Judge Reinhardt's concurrence, he said he didn't think that the issue was so clear. Right. As the panel held. Because it was on plein air review. That's correct, Your Honor. Isn't good faith kind of the opposite side of the coin of knowingly submitted a false return? That is to say, if I knowingly submit a false return, I'm not acting in good faith. But if I am acting in good faith, that's a defense. I mean, it seems to me that there are two sides of the same coin. So why do you object to a good faith instruction? I think the idea of good faith is not about knowing. It's about willfulness. And the reason being is that the model jury instructions from this court and the jury instructions that were provided to the jury in this case discuss what actually is a good faith reliance. Because they were instructed on good faith reliance, just not as to the false and fictitious prongs. And it's not that you can just disagree with the law. It's that you had to have an actual belief that what you were doing was somehow not morally wrong or not in violation of the law. And I think if you allow for good faith just for a knowingly crime, it doesn't apply. Can you hypothesize how someone could make a knowing false statement in good faith? How someone could make a statement they knew to be false in good faith? That's a trick question. That is the question. It is the question. That is the question. And to get to the next question, which is even if good faith is an allowable defense. Why don't we answer this question, not the next question? Sure. I think in theory, it would go to this idea that it goes more towards the idea that you don't know. You knew that the information you were putting on that tax return was false. But because of your belief system, you didn't know that you were actually committing some sort of crime. But I think it gets challenging to think about what a good faith defense would be for a knowing crime. That's why I think good faith goes hand in hand with willfulness, not knowingly. Even so. I just raised the question. But that's, you know, the Sixth Circuit. That's what the Sixth Circuit said. They applied it across the board to each one of the prongs. Yes, in Nash. That's correct. Yeah, even so, Dorotich states that if the jury is correctly instructed on the specific intent, then it's not reversible error to have not provided a good faith instruction. That specific intent isn't an element of a submitting a false claim. In Dorotich, the court said that for 287, the specific intent was knowingly. And because it was knowing, because they were appropriately instructed on the intent requirement, it didn't matter that they weren't provided with a good faith defense. I'd also say that the defendants were still free because they, the good faith was allowed for the fraudulent prong. They were still free to present a good faith defense factually. And I believe that's what Mr. Updegrove was trying to do. And there are, there is a case or there are some cases that say that as long as there's some ability for a defense to, for a defendant to factually present it at trial, it doesn't matter whether or not the jury's instructed on good faith. Okay. Could you address the. Yeah, I ask my acceptance of responsibility question. Is it the government's view that Mr. Updegrove did in fact accept responsibility as a factual matter at trial and say, I, I did know that I was submitting a false statement to the government? No, Your Honor. And Mr. Updegrove acknowledged the act, but he factually argued that he didn't have the intent. The U.S. Sentencing Guidelines state that that is not acceptance. And this court stated in Burroughs that asserting a complete defense based on lack of intent is not acceptance. For that reason, the government, I do not think that, that Mr. Updegrove should have received the reduction for acceptance of responsibility. Now, I guess this will go to the other side in a moment, but the acceptance of responsibility issue troubles me a little bit because the district judge says there's no acceptance of responsibility because he denied in his testimony the factual premise. Ace law says that's not necessarily enough. You've got to look for the rest of the record. Is there anything else in the record that goes to whether he has accepted responsibility Your Honor, there are competing facts because prior to trial, during trial, and even to some extent at the sentencing, there's a lot of blame put on others. He does say, Mr. Updegrove does testify at trial that now I understand it was a false claim, but at the time I didn't. And at sentencing, he essentially says the same thing. And he says I'm trying to fix my issues with the IRS, but that still isn't accepting responsibility. Well, what troubles me is that the district judge doesn't talk about those things. When the district judge says no acceptance of responsibility, the only thing the district judge says is he denied at trial that he knowingly submitted a false return. That's the only thing the district judge says with respect to acceptance of responsibility. Had the district judge articulated these other factors and come to the same conclusion, I wouldn't be troubled. I think under 3E1.1 of the guidelines and under Burroughs, that is all that the court had to determine. Nonetheless, if you look at the entire scope of the sentencing, the judge went through almost an extensive amount of factors in determining what the sentence would be, which was ultimately a 12-month downward variance. And I think the court factually covered almost every aspect that was related to the sentencing  Thank you, Your Honor. Okay. Thank you. Now, you had sought to preserve five minutes. Let's put five minutes on the clock, and then you can divide it among yourselves as you see fit. But I've been pretty lax with the clock. I'm going to be strict with the five. Understood, Your Honor. Thank you. In regards to the willfulness issue, this Court has never required a willfulness instruction. But on the flip side of that, they've never said that a willfulness instruction is not permitted. It's an open area. The courts, they've listed the elements without willfulness, but nobody who has ever said that willfulness should be included has ever been told, no, that's not an element. There's no Ninth Circuit authority on that. And I think it relates to willfulness and good faith are related. In regards to the jury instruction, the government mentioned that the Court advised that a defendant who acts on a good faith misunderstanding of the requirements of the law does not act willfully. So clearly, the good faith applied only to willful conduct, which applied only to the fraudulent prong. And the real issue here for Ms. Moon was that she proffered pre-trial that she intended to pursue a good faith defense, and the Court rejected that. They said, no, there's no good faith on making a false statement, only on a fictitious statement. How do you make a false statement to the government in good faith, a knowingly false statement to the government? Hypothesize how you could do such a thing. Well, she would have argued that because of the way she was instructed by somebody she believed was a tax professional who I think that the government acknowledges they had a cooperating witness who said that in these meetings, the tax plans were put forth as a legitimate tax plan. It wasn't put forth as a big fraud. But a false statement. But the false statement, she would have testified that she was found guilty, but she did not testify. She would have testified that she did not believe it was a false statement because she believed based on her good faith reliance on the tax advice she received, that it was a legitimate tax matter that she was submitting. So she would have argued that it was not a false statement. But the problem is that she would have been prohibited from arguing that in regard to the false prong. Only the fictitious prong is what that would apply to. So basically, you're stuck because the good faith doesn't apply to the false prong that she was convicted under. You've just used two of the five. Do your co-counsel want any time? Yes. Thank you, Your Honor. Just to quickly go through some of the points on the outburst issue, I'm not sure I agree with the characterization that the judge quickly dismissed the jury. It went on for several pages without the Court actually interrupting Ms. Bolanos, and the video shows that she was up and down and gesturing wildly. And this went on for several minutes before the jury was dismissed. The defense theory, as my colleague pointed out, and as Mr. Eptigrove testified, was the good faith reliance on Ms. Bolanos. She was charged in every one of the counts. She was named as the lead conspirator. The other defendants were charged as co-conspirators for her. She was the lead schemer. I don't think it's really accurate now to say that she wasn't the ringleader. That's how the whole case was presented. Bamberger and McCormick, the two cases that opposing counsel cited, in Bamberger, it's actually the opposite holding than co-counsel represented. That court, this court recognized that there was harm to the co-defendants from the outburst of a lead defendant, not that it minimized the harm to the co-defendants. And in McCormick, it was the defendant herself who stood up and defied the judge and was found in contempt, and the court denied the mistrial because the court said the defendant shouldn't necessarily be able to architect her own mistrial by her own misconduct. It wasn't a co-defendant case. And so when we look at the co-defendant cases, we have, they are out of circuit, but I think they're really on point. We have Braswell, Manny, and Aratari, which are discussed extensively in the briefing. So I'll just address three quick points. Manny, again, the court said there was a toxic risk of the outburst. It was so high that we don't necessarily credit the jurors' claims that they weren't prejudiced. In Braswell, the court said we're not, that a defendant, in order to reverse a denial of mistrial, is not required to explore the minds of the jurors. The test is whether the risk was so impermissibly high that there were improbable or impermissible influence. Roberts. Now, you've just used two minutes. Yes. Do you want to sit down? Thank you. And I'll provide the subsequent citations on the acceptance of responsibility issue. I only have one comment, Your Honor. With respect to the argument that Mr. Combs was part of this larger group, I don't think that the record really bears that out. Ms. Bolanos prepared Mr. Combs' tax return, and so he did rely on Ms. Bolanos. And that's at ER 1669, 1670, and 1690. And with that, I will submit. Okay. One last little bit of tidying up. What is it we are expecting from Ms. Giovanni? The record cites for the, for Upter Grove's admission of knowing falsity. Okay. So if you'll submit that in a letter to the court electronically is fine, with copy to the other side within the next, tomorrow would be terrific.  Okay. Thank you. Combs et al. You can stay behind and write it out in a piece of paper and hand it to us while the next case is arguing. Yeah. However you've submitted to us, quick is better than slow. I'm catching an airplane, so I'll submit it by 20 J. That'll be just fine. United States versus Combs et al. Submitted for decision. Last case this afternoon, United States versus, and I'm not sure I'm pronouncing it correctly, Zinow.
judges: W. Fletcher, Paez, Wilken